LYLE W. LEEPER AND LYLOTA R. LEEPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Leeper v. Commissioner
Docket No. 3339-77.
United States Tax Court
T.C. Memo 1979-148; 1979 Tax Ct. Memo LEXIS 379; 38 T.C.M. (CCH) 655; T.C.M. (RIA) 79148; April 16, 1979, Filed George W. McManus, Jr. and James L. Mayer, for the petitioners. Wayne G. Chew, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' joint Federal income taxes: Taxable Year Ended December 31
Deficiency
1970
$19,523.00
1971
47,113.50
1972
26,557.00
In addition, respondent has determined an addition to tax under section 6653(b) [1] against petitioner Lyle W. Leeper in the following amounts: *380 Taxable Year
Addition to Tax Under Ended December 31
Section 6653(b)
1970
$ 9,761.50
1971
23,506.75
1972
13,278.50
At the trial of this case Lyle W. Leeper conceded that he failed to report taxable income totaling $101,567.15 for the years 1970 through 1972. He also failed to present any proof with respect to claimed business expenses of $488 for 1972 which respondent disallowed. The issues remaining for decision are: (1) whether Lyle W. Leeper received additional unreported income for the years 1970 through 1972; and (2) whether any part of the underpayment of income tax for each of the years 1970 through 1972 was due to the fraud of Lyle W. Leeper with intent to evade tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation, together with exhibits attached, are incorporated herein by this reference. Lyle W. Leeper and Lylota R. Leeper are husband and wife who resided in Galveston, Texas, when they filed their petition in this case. They filed timely Federal income tax returns for the years 1970, 1971 and 1972 with the District Director of Internal Revenue, Baltimore *381 Maryland. During the years in issue Lyle W. Leeper (petitioner) was employed by Bechtel Corporation (Bechtel) at the Calvert Cliffs construction site of the Calvert Cliffs Atomic Energy Plant. Prior to 1970 the petitioner worked for Bechtel Corporation on the construction of a power plant in Rochester, New York. When construction of the New York power plant was completed in 1970, the petitioner purchased various surplus construction materials from Westinghouse Electric Corporation for $2,500. He shipped the materials to Maryland at a cost of $1,060. Thereafter he sold portions of the materials to the following persons and in the following amounts: Buyer
Year
Amount
Arthur Kaufman
1970
$11,134
Laman Loesche Supply Co.
1970
3,613
A & J Friedman
1970
2,000
Michael Grisofe
1970
534
Laman Loesche Supply Co.
1971
900
Petitioner did not report the above items on his 1970 and 1971 income tax returns. In addition, he received $3,000 from Southern Maryland Transportation Co. in 1971 as reimbursement and settlement for certain of the above materials which were lost in transit between New York and Maryland. [2] Petitioner did not report this insurance *382 payment on his 1971 tax return. When petitioner was employed by Bechtel at the Calvert Cliffs Atomic Energy Plant construction site, he extracted various kickbacks, services, bribes and paybacks from certain vendors, suppliers and subcontractors for the privilege of doing work or providing supplies at Calvert Cliffs during the years 1970 through 1972. Rocco Luppino (Luppino) was president and part owner of Regal Construction Co. and F & T Construction Co. and general partner of L & R Rental during the years 1970 through 1972. During that period Regal Construction and L & R Rentals rented heavy equipment, including trucks, and supplied various construction supplies, including fill dirt, to Bechtel. *383 Luppino and petitioner entered into an oral agreement whereby Luppino was to pay petitioner $100 a month for each truck rented on a monthly basis and five cents per cubic yard of fill dirt supplied Bechtel by Luppino. Under the formula, as initially agreed to and with certain subsequent modifications, petitioner was entitled to receive $13,262 in 1970, $31,000 in 1971 and $12,404 in 1972. He did receive the total amount due under the kickback scheme. However, the petitioner was in immediate need of approximately $15,000 of the expected payments and could not wait to be paid on a month-to-month basis as provided for under the kickback formula. Luppino agreed that he would advance petitioner the $15,000 and thereafter the parties jointly decided that the advance to petitioner would be made on the apparent basis of material sales to Luppino. Thereafter, on three occasions in late 1970, Luppino ostensibly "purchased" certain materials from petitioner's Westinghouse supplies in the amounts of $6,684.80, $2,650 and $6,250.73. These payments, totalling $15,585.53, were not made for any actual sale of goods, but were made in conjunction with the kickback scheme between Luppino and *384 petitioner. Accordingly, petitioner received from Luppino $15,585.53 in 1970, $28,678.47 in 1971 [3] and $12,404 in 1972. These amounts were not reported on petitioner's Federal income tax returns for those years. Ajax Soil Cement Corporation was a subcontractor at Calvert Cliffs and arranged to have petitioner's driveway repaved and improved in 1970 at a cost of $1,391.75. Petitioner did not pay for these services and did not report the value thereof on his 1971 tax return. During 1970 and through October 10, 1971, Jack DeVaughn (DeVaughn) was employed by Bechtel at Calvert Cliffs. Prior to DeVaughn's assumption of the duties of subcontract administrator for Bechtel in mid-1971, such duties were performed by Leeper. DeVaughn and petitioner both participated in a scheme to obtain the payment of bribes, kickbacks, paybacks and services from various vendors, suppliers and subcontractors at Calvert Cliffs. In an attempt to conceal the payments representing *385 the bribes and kickbacks, DeVaughn opened checking accounts in the names of Construction Services, Free State Equipment, Associated Contractors Service and Rental Equipment Co. The accounts were controlled solely by DeVaughn and were used solely for receiving the payment of the kickbacks, bribes, and paybacks. Petitioner received checks in the amounts of $38,320.60 and $8,538 during the years of 1971 and 1972, respectively, from DeVaughn's personal and company checking accounts as payment of his share of kickbacks, bribes, and paybacks. These amounts were not reported by the petitioner on his 1971 and 1972 tax returns. One of the subcontractors subjected to the scheme used by DeVaughn and the petitioner was Adelphi Builders (Adelphi), a sole proprietorship owned by Leslie Wattay. Adelphi performed stone and masonry work at Calvert Cliffs during 1971 and 1972.Payments by Adelphi were made on monthly billings submitted to Bechtel by Adelphi. The payments were made in the form of check or cash. If the payment was made by check, it was usually made payable to one of the four companies in whose name DeVaughn had opened a checking account and it was deposited by DeVaughn in the corresponding *386 account. DeVaughn would then issue checks from those companies to petitioner for his share. On two occasions in 1972, Adelphi paid its monthly paybacks by delivering two checks in the amounts of $3,000 and $2,000 payable to Renovation Supply. These checks were not deposited by DeVaughn, but were cashed for petitioner at a cost of $300 by some friends of Luppino. If the payment was made in cash, the money would be delivered to Luppino who was responsible for turning it over to DeVaughn. With the exception of the two checks drawn to Renovation Supply, petitioner did not receive any paybacks in cash or otherwise from Luppino on behalf of Adelphi but received all monies on the Adelphi payback scheme only from DeVaughn. Accordingly, petitioner did not receive any of the cash payments made by Adelphi in 1971 and 1972. In conjunction with the Adelphi paybacks, petitioner also received in 1971 services valued at $1,095 for finishing concrete and masonry work on his garage. This amount was neither paid by petitioner nor reported on his 1971 tax return. Petitioner also received cash kickbacks from McCormick Asbestos Co. The amount he received was computed on the amount of asbestos *387 purchased by Bechtel. The initial arrangements between petitioner and McCormick were made through Roland Cumor, an employee of McCormick.In his arrangement with Cumor, petitioner was to give Cumor 25 percent of the total payments he received from McCormick. During 1972, McCormick issued five checks payable to cash in the amounts of $538, $432, $431, $474 and $426. Contemporaneously with the issuance of the checks, petty cash vouchers were prepared by McCormick for internal use and control. Upon the cashing of the checks, petitioner was paid $1,726 by Cumor, an amount equal to the total of the checks less Cumor's fee. These payments were not reported on petitioner's 1972 tax return. Petitioner received, but did report, $2,000 in cash kickbacks from Capital Crane in 1971. In the same year he received certain supplies and materials from Schumacher & Seiler in the amount of $645.78, which was paid for by Glenn Wheeler of Ajax Soil Cement Co. Petitioner subsequently repaid Wheeler. Petitioner sold a boat and motor in 1971 for $1,500. The boat and motor originally cost petitioner $2,000. Finally, petitioner acknowledges that he received additional unreported income of $460 in *388 1970 from an unidentified deposit into his personal checking account. Petitioner misled the government agents when they initially questioned him with respect to his sources of income for the years 1970 through 1972. He sometimes utilized cash as a medium of receiving various amounts of bribes, kickbacks and payabacks in order to prevent the money from being traced to him.He used false documentation to conceal the receipt of income. He failed to maintain any records of the payments in cash or by check of the bribes, kickbacks and paybacks which he received, and he failed to provide accurate information to the preparer of his tax returns. Petitioner is the same person who was the defendant in the criminal case of United States v. Lyle W. Leeper, Docket No. 75-0112 (D. Md. 1975). The respondent herein is a party in privity with the United States of America, the prosecuting party in the criminal case in which the petitioner was the defendant. The indictment filed on February 13, 1975 in the criminal case contained the following charge against the defendant, the petitioner herein: The Grand Jury charges that Lyle W. Leeper did willfully attempt to evade and defeat his Federal *389 Income Tax for the years 1970, 1971 and 1972 in violation of I.R.C. § 7201. The petitioner entered a plea of guilty before Judge Joseph H. Young of the United States District Court on February 21, 1975 to one count of violation of section 7201, I.R.C., for the taxable year 1972. On August 6, 1975, the United States District Court entered its judgment pursuant to the guilty plea. Among the issues of facts presented and determined in the criminal tax case were whether the defendant therein (and the petitioner herein) did, in fact, willfully file a false and fraudulent Federal income tax return for the taxable year 1972 with the intent to evade and defeat income taxes and whether he did, in fact, by such means understate a part of the income taxes due and owing by him to the United States of America for such year. The findings of fact that the petitioner did willfully file a false and fraudulent Federal income tax return for the taxable year of u972 with the intent to evade and defeat taxes, and that there was due to such fraud an underpayment of the correct income taxes due and owing by the petitioner for that year, were essential *390 to support the judgment of conviction entered in the criminal case. ULTIMATE FINDINGS OF FACT 1. Petitioner substantially and deliberately understated his taxable income for the years 1970, 1971 and 1972. 2. A part of the underpayment of income tax for each of the years 1970, 1971 and 1972 was due to the fraud of the petitioner with intent to evade tax. OPINION Issue 1--Understatements of Income.
As previously indicated, the petitioner has conceded that he understated his taxable income by $101,567.15 for the years 1970 through 1972. He disputes the remaining amounts which total approximately $86,000. Petitioner contends that certain items of additional income listed in the deficiency notice are duplicative. First, he maintains that some of the payments made by Luppino for the truck and fill dirt kickbacks are represented by a fictional sale of materials to Luppino's construction firms, sales which have been picked up in income independent of the kickback scheme. In addition, he asserts that part of the kickback payments were to be made in the form of a one-third interest in certain real property purchased by Luppino. This property right was never officially *391 transferred to petitioner and has recently been sold by Luppino to another party. Respondent, on the other hand, contends that Luppino never gave petitioner any interest in real property as part payment for the kickback, but that the petitioner actually received the entire amount of cash proceeds due him under the kickback scheme. Respondent also contends that the sales were real and that they are independent of the kickback arrangement. We agree with petitioner that the sales are related to the kickback scheme. We think it unlikely that truck rental and general contracting firms could have had much use for the specialized electrical equipment that was the subject of the "sales." Moreover, no purchase orders were produced by Luppino to demonstrate that the goods were ordered. We found petitioner's testimony credible on this issue. Accordingly, the duplication in the notice of deficiency must be eliminated. We do not find, however, any reason to reduce the amount received by petitioner in the Luppino kickback scheme by the allegedly promised one-third real property interest. Although it is true that Luppino did purchase the property during the kickback period, no convincing *392 evidence exists that there was any agreement between Luppino and the petitioner to credit part of Luppino's obligation by the property interest. In fact, petitioner's description of how the value of the property interest would be determined for purposes of crediting Luppino's obligation under the payback scheme is not persuasive. The next major dispute relates to the payments made by DeVaughn to petitioner and payments allegedly made by Adelphi Builders to petitioner through Luppino. Petitioner concedes that he received the payments listed in the deficiency notice coming from DeVaughn and his various company checking accounts.He denies, however, that he received any cash from Luppino on behalf of Adelphi and contends that any cash given to Luppino by Adelphi was passed on to DeVaughn in accordance with the payback scheme. Thereafter, petitioner maintains, the monies were distributed by DeVaughn to him in the amounts he has conceded. Thus, he asserts, the listing in the deficiency notice of cash through Luppino from Adelphi is a duplication of the amounts received from DeVaughn. To the contrary, respondent contends that Luppino never passed the cash received from Adelphi to *393 DeVaughn but instead gave it to petitioner. In this regard respondent again urges that we do not find a duplication of income items. On this matter we agree with petitioner. We believe his testimony that he never received any cash from Luppino on behalf of Adelphi. None of the testimony by Adelphi's owner, Leslie Wattay, or Luppino contradicts petitioner's testimony. Moreover, we regard DeVaughn's testimony as unpersuasive. Finally, we note that if Luppino used any of the cash he received from Adelphi to meet his obligations to petitioner, the use of that cash should properly be included only once in petitioner's income. With respect to the McCormick Asbestos Company payments, we think that petitioner received the entire amount of the checks issued by McCormick less the 25 percent payment to Mr. Cumor. Petitioner's testimony on this matter was vague and he admitted to a lack of knowledge as to how much he actually received. On the other hand, we found respondent's witness, Robert McCormick, both credible and persuasive. Issue 2--Additions to Tax under Section 6653(b).
Respondent determined that part of the understatements in petitioner's income was due to fraud. *394 The burden of proving fraud is on respondent and he must satisfy this burden by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Kreps v. Commissioner,351 F.2d 1, 7 (2d Cir. 1965), affg. 42 T.C. 660 (1964); Foster v. Commissioner,487 F.2d 902, 903 (6th Cir. 1973), affg. per curiam T.C. Memo. 1972-188; Marcus v. Commissioner,70 T.C. 562, 577 (1978). As to the year 1972, there is no question that respondent has carried his burden. Petitioner pleaded guilty to willfully attempting to evade his income tax for 1972 and the United States District Court entered its judgment on the basis of his plea. He is therefore collaterally estopped to deny fraud for that year. Arctic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964); Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). As to the years 1970 and 1971, respondent must show that the petitioner intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of *395 such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner26 T.C. 107, 112-113 (1956). The respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment is attributable thereto. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). If fraud is established, the 50 percent addition to tax under section 6653(b) is imposed, not only on that portion of the underpayment which is the result of fraud, but on the entire deficiency. Sec. 6653(b), (c); Stone v. Commissioner,56 T.C. 213, 220 (1971). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Menski v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner,supra at 105-106. Since fraud can seldom be established *396 by direct proof of intention, the taxpayer's entire course of conduct can often be relied on to establish circumstantially such fraudulent intent. Stone v. Commissioner,supra at 223-224; Otsuki v. Commissioner,supra at 105-106. Based on the entire record, the evidence clearly and convincingly establishes that the petitioner fraudulently underpaid his taxes during the three years in issue. His returns substantially understated his income for each year. Such a consistent pattern of understating substantial amounts of income over a period of several years, standing alone, is persuasive evidence of fraud. Holland v. United States,348 U.S. 121, 139 (1954); Adler v. Commissioner,422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Agnellino v. Commissioner,302 F.2d 797, 801 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court; Shahadi v. Commissioner,266 F.2d 495, 500-501 (3d Cir. 1959); *397 Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1139 (1970). We recognize that such principle should be applied with caution where the finding of unreported income is based on the taxpayer's failure to meet his burden of proof in some respect. See Otsuki v. Commissioner,supra at 106; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971). However, our conclusion is not based on the petitioner's failure of proof, or his failure to report substantial income, because there are other significant indicia of fraud in this case. First and foremost, the petitioner admitted at trial that he failed his 1970, 1971 and 1972 returns with fraudulent intent. Second, he admitted to repeated omissions of income throughout the years 1970 through 1972 involving substantial amounts of cash. Merritt v. Commissioner,301 F.2d 484 (5th Cir. 1962). Third, the petitioner used the medium of cash rather extensively to conceal his sources of income and to prevent the tracing of omitted income to him. Mensik v. Commissioner,328 F.2d 147 (7th Cir. 1964), *398 affg. 37 T.C. 703 (1962). Fourth, he failed to keep books and records of the payments he received. Spies v. United States,317 U.S. 492 (1943); Millikin v. Commissioner,298 F.2d 830 (4th Cir. 1962). Fifth, the petitioner's specific intent to evade and defeat taxes which he knew were properly due and owing on his income tax returns is further demonstrated by his false explanations and attempts to initially mislead the investigating government agents. Spies v. United States,supra at 499; Sherman v. Commissioner,T.C. Memo. 1977-261. Sixth, he failed to provide his tax preparer with adequate or accurate information for the preparation of his tax returns. Farber v. Commissioner,43 T.C. 407, 419-420 (1965). Accordingly, we hold on this record that part of the underpayment of tax for each of the years 1970, 1971 and 1972 was due to the fraud of the petitioner. To reflect the concessions made by the petitioner and our conclusions on the disputed issues, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Respondent determined that petitioner received $5,000 from Regal Construction in 1971 for the sale of certain of the Westinghouse construction materials. Respondent also included in the notice of deficiency the $3,000 insurance settlement. These items are duplicative; the $5,000 purchase order from Regal Construction was used as the basis for valuing the items lost in transit. Petitioner did not receive $5,000 from Regal Construction since the goods were lost and not delivered.↩
3. The amount for 1971 was calculated by taking respondent's original figure of $31,000 and subtracting $2,321.53, the difference between what petitioner actually received in 1970 and the respondent's original computation.↩